DBA, VIP Care, Physician Partners, LLC, et al, 24-13581. Again, I'll give everybody a chance to get all situated. Mr. Winnick, I see that you are going to be sharing your time, and you also are reserving some time for rebuttal. You may proceed. Thank you, Your Honor. Good morning, and may it please the Court, Daniel Winnick for the government. Every court of appeals to have addressed the question, and every district court other than the one in this case, has held that the QI-TAM provisions of the False Claims Act are consistent with Article II. And this Court should join that consensus. But all the circuit courts who have addressed this, it's been a while. It's been about 25 years, and we have some recent statements from the U.S. Supreme Court in both dissenting and concurring opinions that suggest that the Supreme Court might, on the appropriate case, take up the issue of the constitutionality of the QI-TAM provisions under Article II, correct? Several justices have expressed that, and the Supreme Court may take it up, but we think all of the prior decisions were correct. And even since the district court decision in this case, I think the dozen or so district courts that have considered the issue have all rejected the analysis here, most of them in circuits not guided by precedent. Before you get started, can I ask you a point of clarification? It's referring to something that's in your gray brief, talking about the refinement of the government's position. Yes. In so refining your position, explaining that the Supreme Court in a different case, you've argued before the Supreme Court that a private actor who is empowered to adopt binding rules governing private conduct on a continuing basis would be an officer of the United States subject to the Appointments Clause. Do I take that concession to mean that you accept that the test that the district court utilized to determine if someone is an officer of the U.S., you agree that that test should be applied, you just disagree with the district court's application of that test? I'm not sure I would say we agree with every element of how the district court articulated the test. But you agree it's appropriate that we should be going through a test to determine if the QI-TAM relators are officers of the United States? I think we no longer press the view that simply because they are private persons outside the government that there's no Appointments Clause question, just by virtue of that. The basis on which we urge the court to resolve the Appointments Clause issue, which we think is really the most straightforward, is that relators don't occupy a continuing position established by law. The basic requirement for an office to be continuing, as Chief Justice Marshall explained in Morey's, is that the duties continue, though the person occupying it be changed. So if the Secretary of State leaves office, another person continues the duties of the prior secretary because the duties of the office, not of the person. And relators don't work that way. The False Claims Act says expressly that when a person brings an action under the QI-TAM provisions, no person other than the government can intervene. And so that's what makes the role of the relator personal. It's specific to the person. It's not a continuing office. The district court and defendants say otherwise only on the theory that the statute mentions relators, and so there can be many relators pursuing many different QI-TAM actions at a given time. But if that were correct, it would have meant a different outcome in the Supreme Court's decisions in Germain and Outhmore. In both cases, statutes talked about the roles of civil surgeons and of merchant appraisers, and that wasn't sufficient for the Supreme Court to say they were offices. The Supreme Court recognized that those were ad hoc positions. I'd like to segue, just given the time, if I may, to the Vesting Intake Care Clauses. As we recognize in our reply brief— Can I ask, before you get there, can I ask one other question?  Has the Supreme Court ever applied the Appointments Clause to someone who was not paid through some sort of independent contractor relationship or employment relationship? I'm not aware of such a case, no, Your Honor. Would—how about as a single justice case? Is there any that exists in that context? Not to my knowledge. I can't represent with certainty that there are none, but I'm not aware of one, no. How about any other circuit? Again, not that I'm aware of. I think the notion of applying the Appointments Clause to persons outside government, again, as we recognized in our Consumers Research Brief, it's not that, as a theoretical matter, there's no scenario where the clause can have application in that circumstance, but it's certainly not the mine run of Appointments Clause cases. So on the Vesting Intake Care Clauses, we recognize that key TAM suits under the False Claims Act do differ in some significant respects from private suits to enforce other provisions of federal law, and those differences would create Article II questions if key TAM suits were a novel development, but they're not. Abundant evidence since the founding shows that Congress, the executive branch, and the courts have viewed key TAM suits as a constitutionally permissible means of enforcing federal law. The district court didn't address the vesting issue, correct? Correct. Why should we in the first instance? We certainly don't object to the courts remanding it if it doesn't want to reach it in the first instance. But why should we, I guess, is what I'm asking. I know you don't object to it. You don't really have a basis to, but why should we do one or the other, I guess, is what I'm asking. I don't know that I have a strong view one way or the other. I mean, it's a purely legal issue, and so no party has urged that, you know, it requires fact-finding or the application of discretion or something like that. I don't think there's any reason the court couldn't, but we're not suggesting, we don't have a problem with the court remanding to let the district court look at it in the first instance, and we agree it didn't do so. So the Supreme Court discussed the history both in Marcus and Stevens and found it well-nigh conclusive as to the Article III issue in Stevens. We think, as the unbanked Fifth Circuit said in Riley, that it's equally conclusive as the Article II issue. And this court has itself said that key TAM actions were regarded as a routine enforcement mechanism in the early republic. It said that in Gates. But at the same time, we're doing, those decisions are dealing with Article III, and certainly the Supreme Court has explicitly reserved the issue of the constitutionality under Article III. I agree. We're not suggesting that Stevens is binding on this court in that regard or anything. But, you know, I think defendants' basic line of thinking on the history, I don't take them to dispute that the history sort of is what it is. I think they dispute the relevance of the history, and they sort of treat it as thoughtless and anecdotal and not really reflecting a considered view of the constitution. But we think that's both irreconcilable with Stevens and wrong on its own merits. As to Stevens, they haven't explained why the same history that they treat as anecdotal, thoughtless, sort of basically meaningless in this context would have been taken so seriously in Stevens. And even setting Stevens aside on its merits, you have to overlook an awful lot to conclude that the embrace of ketam actions in the early republic was thoughtless. It's really not just the fact that the provisions existed, but that they were extensively litigated, including by constitutional luminaries. Can I go back to the appointments clause for a second? Of course. So you argued to us what I'll call the second prong of the test, the continuing position prong. Right. You didn't argue to us, I just want to be clear, the exercising significant authority prong of the test, right? So the way we have— You agree you didn't argue that to us right now? This morning, that's what we asked. And the way we've refined that in the briefs is we're no longer taking the view, as we said in the opening brief, that as a categorical matter they do not exercise— I understand the categorical, but I'm talking about here. Correct. So the point we make on the second prong is that Congress assigned the position outside the government workforce, and the only way that creates an appointments clause issue is if relators are performing a function that only the government can constitutionally perform. And we think, for essentially the reasons we're expressing in the context of divesting and take-care clauses, that isn't the case. Again, we don't think the court needs to reject it. So you think—I just want to be clear—you think that Justice Thomas is incorrect in Polanski that the directing of litigation, the initiation of litigation on behalf of the United States is not exercising significant authority under the laws of the United States? We think that under the False Claims Act, given the control mechanisms, nothing a relator has the power to do is something only the government can constitutionally do. And so I want to be clear about what we're saying and what we're not saying. What we're saying is that the only unilateral power the relator has under the statute is to file a complaint under seal and allow the government to decide whether it can proceed. The government can intervene at the outset and take it over, intervene and dismiss it at the outset without any adjudicatory role for a district court, unless it's violated the Constitution in doing so, or the government can make a decision to allow the relator to pursue the action. And if it does, it's making an affirmative choice to allow the relator to go forward. So we don't think that simply bringing the action under seal is a function only the government can constitutionally perform. So you're standing on your briefs and the argument in your briefs about significant authority issue. Not quite. Let me be clear. Certainly on the reply brief, everything we say in the reply brief is right. The point we made in the opening brief that we have not renewed in quite the same way is we're no longer saying that the role performed by a relator in sort of any context wouldn't be significant authority. What we're urging the court to say, to the extent it reaches this second part of the Appointments Clause, and we don't think it has to. We think it should stop at the fact that this isn't a continuing office. But what we're saying on the second prong is you look at whether the function is one that only the government can constitutionally perform, and that's not the case here for essentially the same reasons we're saying under the Vesting and Take Care Clauses, which is that the role of a relator under the statute of unilateral power is very limited, and there's a very, very extensive historical pedigree of the founders in all three branches of government treating key TAM actions as uncontroversial. So what you're saying is if we were to agree, and this is just a hypothetical, with everything that you're saying here today and in your briefs, you would expect to see an opinion that only addresses the continuing position prong? As to the Appointments Clause, yes. As to the Appointments Clause, correct. As to the Appointments Clause, yes. Thank you, Your Honor. I'll preserve the balance of my time for rebuttal. Thank you very much. Mr. Singh, and you also are reserving some time for rebuttal. May it please the Court. I'm Thijinder Singh for the relator, Dr. Chloris Zafirov. I'd like to amplify, if I could, the salient points about the history, because I think history provides an answer to both of the constitutional questions presented in this case. Can we talk about, if we can drill down on the significant authority issue, how is Justice Thomas wrong in his dissenting opinion in Polanski as to the significant authority prong of the test? For essentially the reasons that my colleague gave you just now, that language that Justice Thomas gave is drawn from Buckley v. Vallejo. Buckley, of course, is a case about FEC commissioners, and when those individuals initiate enforcement actions, what they're doing is moving the machinery of the government toward enforcement. That is not what a private relator is doing. Private relators can't marshal government resources for their case. They can't compel the government really to do anything. So here's what the district court said regarding this, and what I read, and Justice Thomas purposely isn't going into detail about this, but what I read him and understand. That is that the initiation of a lawsuit on behalf of the government itself is something that only the government can do, number one. Number two, even when it files and even under the limitations that your learned counsel, your counsel at your table just discussed, that drives the government to have to investigate, which is then telling the government how to utilize its investigatory authority. It is required to investigate, and that decision is being made by someone who has not been appointed. Those two things together seem to be, A, pretty close to what the FEC did, and B, seems to be significant authority being exercised under the laws of the United States. What am I missing there? I think not, Your Honor, and I can give a few reasons. The first is, first to distinguish Buckley, we have some stuff about this in our briefs. Public Citizen has filed an amicus brief that I'll call the Buckley brief, which is just all about Buckley. The Constitutional Accountability Center brief also deep dives on Buckley and explains how the powers of QUTAM plaintiffs and the powers of FEC commissioners are nothing alike. So that's one thing. But even just ignoring that discussion of the FEC, which is tangential. When a lawsuit is filed here, it's very different even than other ordinary civil litigation. Normally, if I file a lawsuit, I then serve it on the defendant, and the party gets started. We have a case. But in this case, of course, that doesn't happen. I file under seal. I only give it to the government. And then it is solely up to the government to decide what to do. That is, the government is required to investigate by statute. That's true. But nothing tells the government how to investigate. They can devote as much or as little resources as they want. Now, you might say, even that one step of requiring the government to investigate seems to trench on their discretion. But this happens all the time in the law. A really good example is Title VII. If a plaintiff files a charge with the EEOC, the EEOC has to investigate. That is administrative before the lawsuit is filed. In other words, there isn't a lawsuit being filed in the Title VII context. You go to EEOC, EEOC decides what it wants to do, and then it chooses whether it wants to file or not. And then it says, okay, no, feel free to go ahead and vindicate your private rights at that point. That is true, Your Honor, but I think that's possibly a distinction without a difference because either way— Well, it's pretty big for the two things that I talked about, which is initiation and investigation. Well, but, Your Honor, either way, executive branch investigatory resources are being directed by a private person, as you phrased it. And moreover, I guess what I would say, just to emphasize the point that I led with, is the very long history of these statutes, I think, disproves the premise that what is happening here— Well, it may disprove the unconstitutionality. I don't know that it disproves the significant authority issue. I'm not sure those two follow from each other. History certainly plays an important part here in whether we decide what the constitutionality is. I don't want to discount it at all. But that doesn't mean that if there's a two-prong test that we have to apply, that at least as to one of those prongs, that the initiation of a lawsuit on behalf of the government for a public interest and then the things that follow that— And we didn't even talk about the other part, which is where the government decides not to do anything. At that point, the driver's seat is all in the litigant's hands at that point, right? Well, yes and no, Your Honor. So the litigant is in the driver's seat, but the government is still in the passenger's seat and able to grab the wheel at any time. And that's a significant difference from— Let me interrupt you if I could for a second. And at the risk of being perhaps overly practical, I haven't been a judge for 35 years in Miami with a lot of key time cases, right? And the way I've seen them from— and maybe practicality has nothing to do with deciding a constitutional issue. That may be a very good point. But since history does, it gets filed practically. It gets sealed. The district court knows nothing about it. And I know the statistics say that only in 20 percent does a government interfere. I haven't kept statistics for myself for 35 years, but I think that's actually overstated, at least in the Southern District of Florida. So it does seem like the government always asks for delays. Now, I don't know what happens. And some judges are more patient than others. And maybe practicality has nothing to do with it. But about the significant authority, the judge, the impatient judge, after several extensions of months, eventually says, no more. Some say, yes, no more. It's a case that's sitting there that I don't know anything about except the complaint is filed. And then magically, the government, in a lot less than 20 percent of the time, they don't—in any time, they don't interfere. And the relator comes, and as far as me as a district judge, you treat it like any other civil case because there is also a lot of fraud cases brought by the U.S. attorney. So you have the civil litigant doing that and the United States. And that's why I think that may have something to do with significant authority. And the history is a very good thing. And maybe there's some practical reasons why this may create chaos. I don't know. But sometimes the Constitution creates chaos. Help me out. What do I do with that? Just not think about it or what? No, Judge Moreno, I actually think your point is a strong point in our favor. That is to say, in the situations where the government allows the lawsuit to proceed, you'll see this on page 28 of the government's brief. They say in all of those situations, the lawsuit is only allowed to proceed if the government has determined that it is consistent with the enforcement priorities of the United States. And my colleague just told you that they affirmatively decide to let those cases go forward. Sorry, if I may. You may finish answering, Judge Moreno. And the second part of the answer, the practical part, you were saying the lawsuit proceeds like any other lawsuit. Critically, it proceeds like any other private lawsuit. In those cases, the relators don't suddenly get access to government resources. No one's handing them a windbreaker and a gun and letting them go investigate and carry this out like the government could. They're litigating in the same way that a private fraud litigant would litigate. And that, we think, really distinguishes this from any significant government authority. In that situation, it essentially becomes a private action where the government will benefit as a byproduct. It doesn't become a government enforcement action led by a private person. Thank you, Mr. Singh. Mr. Shanmugam. And I see that you're sharing your time with the Chamber of Commerce. You've got 15 minutes. Great. Thank you, Judge Branch. Kenneth Shanmugam of Paul Weiss for the Apple East. May it please the Court. The False Claims Act violates Article 2 of the Constitution by authorizing private parties to bring suit on behalf of the United States. Private parties acting as relators may initiate enforcement actions in the government's name, conduct those actions as they wish, seek treble damages and statutory penalties, and bind the government through judgments. There can be no doubt that relators exercise significant executive authority in each of those respects, and yet they are not properly controlled by, appointed by, or accountable to the executive branch. But that's only one part of the test. Let me ask you this. Do you agree with me that Justice Thomas and Polanski did not address the second prong, the continuing authority prong? With regard to the appointments clause, that is correct. I have to say, that seems significant to me that he didn't go there. What significance should I draw from that, if anything? And I guess give me your best case for why this does meet the continuing prong, assuming I agree with everything you just started off with on the significance. Sure. So I would say at the outset that the vesting intake care clause arguments overlap significantly with the appointments clause argument in precisely this respect, Judge Locke, because the exercise of executive authority is at the core of those overlapping provisions. That's why everybody is addressing those issues before this Court. And I would just note that for purposes of expediency, recognizing that this case may very well move from Forsyth Street up north to First Street, that this Court should address all those issues as well. And certainly for purposes of the vesting intake care clauses, once you conclude that there is the exercise of significant executive authority, you are at the end of the analysis but for the issue of history, to which I will return. Now, with regard to the continuing position requirement, Judge Locke, you asked the question of what is the closest analog to this looking at the case law on the appointments clause. That's not quite the question I asked. The question I asked, and I'll ask it again, is has the Supreme Court or any circuit ever addressed an appointments clause case that applied the appointments clause to someone who was not either under the employee or under contract in any manner whatsoever in any sort of employment relationship whatsoever with the United States? So, no. But what I would say immediately after that, Judge Locke, is that on this issue of the application of the appointments clause to private parties, we would, of course, go all the way back to Chief Justice Marshall's opinion, sitting as a district court in the Maurice case. That's why I asked about the single justice case also. Yes, because I do think that he quite plainly indicated his view that the appointments clause could extend to contractors. Now, as a matter of first principles, why does that make sense as a constitutional matter? Well, because a contractor still is in some sort of employment contractual relation. That's why I phrased the question the way I did. Fair point. Because I think there's a difference between someone who is under contract to the government and someone who has zero connection to the government, a true private person. And in our view, that makes the constitutional problem for Article II purposes worse because, of course, it is the complete outsourcing. Let's assume I agree with you on that, but not as to the appointments clause. In other words, it may be that that is fundamentally wrong and really, really harmful in lots of ways that contravene sort of the nature of our government. But I don't know how that plays in for the appointments clause. Well, I think what I would say, I think the best opinion on this issue, given I recognize it's not a majority opinion, is Judge Walker's recent separate opinion in the FINRA case, the Alpine case that we cite in the materials, which discusses this in some detail. And, of course, our first principles submission with regard to the appointments clause is this would create an enormous constitutional loophole because it would permit the outsourcing of executive authority outside the government entirely. But that's not true. Counsel, that's not true if there's another provision of Article II. Well, and certainly—sorry to interrupt, Judge Walker, but certainly we have no objection if you rely on the vesting and take care clauses as a backstop here. I think our submission is simply that as the government now agrees, there's really no principled reason to treat this situation differently for appointments clause purposes. Now, I recognize— Sorry, going back to my—and I'm sorry for interrupting. Going back to my first question, do you think that what Justice Thomas is communicating is this really does all come down to whether somebody is exercising core authority and whether they're approved or blessed in some matter either by employment by the government as a level three or appointment for levels two and one? In other words, it has to be one of those things for someone to exercise government authority. Do you think that's what he's trying to communicate? I think that is effectively right when you sort of think about all of this together. And how that cashes out in practice is that I think we would acknowledge that there are circumstances, certainly, under which federal contractors can operate consistent with Article II. Take, for instance, a private law firm that is employed, as sometimes happens by DOJ or the FTC, precisely because the executive branch is exercising substantial, essentially complete control, if not on a day-to-day basis. They're employees. Someone like that's just an employee. No different than the janitor who sweeps up the floor of a government building who's on the employee of the government. They're employees. I think that's correct, though I think that there could be circumstances, and this takes us back to Chief Justice Marshall, where a contractor is operating in a way that presents an appointments cause problem. And I would submit to you that that is where the contractor otherwise satisfies the test for the appointments cause. The last I'll do in this, I don't want to take up too much of your time, but it just seems to me in reading as many of these cases as I possibly can that what the court is trying to distinguish is between level three and level two. Are you an employee or are you someone who needs to be appointed under one of the mechanisms that our Constitution says? Not, and I can find no case that are you outside of all of this framework and are you inside of it. That seems to be a different case and may implicate another part of Article II but not appointment part. That's what I'm, candidly, what I'm struggling with. And the other source I would point you to is the 2007 OLC opinion, and I think that its discussion of this is also helpful, but I think our position on this, Judge Locke, is that there's no reason you can't treat contractors and others as subject to the same test. And in analyzing whether or not it is a continuing position established by law, and what's different with contractors is often Congress doesn't say very much about it. It's just a matter of contract between the executive branch and the contractor. Here, by contrast, you have an entire statute that effectively creates an office of the relator, and that is precisely why our argument is that the relator is materially identical to the independent counsel, the special prosecutor, or the bank receiver, and the relator is not operating in the same intermittent fashion as the civil surgeons or the merchant appraisers that were at issue in Germany. You're also, in your briefing, on your briefing on this point, you are arguing that the position of the relator is not personal to the particular individual, that typically when you're looking at an officer of the United States, the person, even in Morrison, you know, the position is moving from person to person as they resign or perhaps die, the office is always going to be filled. But here you're saying, similarly, the relator should operate that way, and in fact it's not personal to a particular individual. The problem I'm having with that argument is you cite three cases to prove your point, and you say first, you know, if a relator's complaint is dismissed on procedural grounds, another relator may step in, and you cite Kellogg. In that case, though, you have a relator whose case is dismissed on procedural grounds, and the relator is allowed to file another lawsuit. You are then also talking about replacement in bankruptcy and replacement in death, and there you're dealing with, you know, the estate of the relator. So it seems to me in those cases it is still tracking personally a lawsuit that belongs to the relator. It's very different from an officer position that is constantly being filled by different people. So, Judge Branch, two points in response to that, and then I do want to spend at least a few minutes talking about the history with the court's leave. I think that the two points I would make are, first, that I think in conducting this analysis you have to look at the position of relator as a whole and not simply look at individual cases. And so, of course, there are many, many relators at any given time that are fulfilling the function of relator created by statute. But, second, even if you look at this on a case-by-case basis, the reason why a relator is unquestionably different from, say, an independent counsel is precisely because the relator self-appoints. And in that regard, it is, of course, not surprising that precisely because the relator self-appoints, if the relator falls out of the equation for some reason, either because the relator dies or the relator fails to prosecute the case, the way that a new relator steps in is somewhat different. But that, again, exacerbates the constitutional difficulty. What makes this so different and a step beyond even the independent counsel in Morrison v. Olson is the fact that you have a relator who can self-appoint, decide the scope of the investigation, who the defendants are. In the independent counsel context, all of that is controlled by an executive official, namely the Attorney General. Now, I do want to say a little bit about the vesting and take-care clauses, not just because of what Justice Thomas said in Polanski, but also because I do think that when you look at the growing chorus of lower court judges, people like Judge Duncan, Judge Ho, who have written about this, I think they have seemingly focused on that, and I think for good reason. And that is because once you conclude that there is the exercise of significant executive authority, that there is insufficient supervision and control, that is effectively the end of the analysis. Now, what about the history here? Our view is that the right way to think about this from an originalist perspective is that where you have a situation as here, where the constitutional analysis clearly points in one direction, and where as here, in our view, the history is indeterminate. The history is simply insufficient in this context to overcome the application of clear constitutional principles. That is exactly how Justice Thomas approached this in his dissenting opinion in Polanski, and I would submit that it is consistent with what the Supreme Court has instructed litigants and lower courts in its most recent constitutional decisions. I would point, for instance, to what the court said in Bruin. This is 597 U.S. at 36. Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text. But we have a lot of pre-ratification history here. I agree with you if we were solely focused on post-ratification history. Certainly, the further you get out, the less relevant it becomes. But a lot of the focus of the history here is on pre-ratification, is it not? Sure. So, Judge Leck, let's go right to what Justice Scalia said in his majority opinion in the Stevens case. Of course, there he was addressing the Article III question, and in his opinion, after analyzing the doctrine, concluding that there was a partial assignment, he said that the conclusion that there was standing was confirmed by the history. Now, he went through both the pre-ratification and post-ratification history. But notably, in that footnote, leaving this very question open 25 years ago, he put that footnote right at the end of the historical discussion, perhaps a signal that he did not think that the history was dispositive here. Now, why might the history not be? But also the issue just wasn't teed up. I mean, he was being wise. We're not going to decide more than we have to decide. Well, but let me offer a reason why the historical analysis could operate differently here, and that is because Article II, unlike Article III, represented a radical departure from the pre-existing English regime, the regime of parliamentary supremacy. And I'm familiar with the arguments both made by you and by the amicus briefs on this, and that may be right, but it seems to be incongruent to argue the post-ratification doesn't matter because it happens to be consistent with the pre-ratification. But you're telling me, well, we had this sea change in Article II, which I agree with you, of course, but then we kept doing very similarly post-ratification. Judge Locke, as you know, I'm happy to take the post-ratification history on its terms. Our fundamental submission is that you do not have the well-established, unbroken line of history that you need, particularly where the constitutional arguments fall on one side of the scale. And I think that that is particularly true because there is no evidence of deliberation at the time about the constitutionality under Article II. There's some—you know, I know that's one of the arguments you make. There seems to be—I mean, it all depends on how you define deliberation, I guess. But, you know, you see some history between President Washington and President Jefferson in part in context where this comes up, discussing it with their attorney generals about whether they can pardon and having some back and forth there. It looks like some of this was sort of contemplated by some of our founders, was it not? Well, I think that that is pretty scant evidence. Certainly, if you contrast this with, say, the issue that was before the Supreme Court this week in the slaughter case, the issue of presidential removal of power, that was, of course, the subject of extensive debate at the time of the first Congress. But beyond that, with regard to these statutes, Mr. Winnick is right that there's really no disagreement, no real disagreement about the history here. We're content with what Justice Scalia said in Stevens, that there were five true qui tam statutes that were enacted by the first Congress. And, of course, you have to look at statutes that not only provide a bounty but that provide the right for a relator to pursue an enforcement action. There's, frankly, very little evidence of their enforcement. And as the Court is aware, these statutes were largely carryovers or stopgaps that quickly fell into disuse. But the critical point I want to leave the Court with on the history is the point that we make in our briefs, which is that these statutes prove far too much because they did not provide for any degree of governmental control and often permitted criminal prosecution. And this is a huge problem from the other side. When you hear from the other side on rebuttal, if they do not take the position that an individual, a private individual could pursue even criminal prosecution, then that is effectively an acknowledgement that the line has to be drawn in a different place than the history would suggest. And once that acknowledgement is made, the history is no longer the silver bullet the other side suggests. And the last thing I would say about the history is look at the government's reply brief and look at it closely in this case. Something certainly happened between the filing of the opening brief, which was before January 20th, and the filing of the reply brief. The government furiously backpedaled from various aspects of its argument, but particularly with regard to the vesting and take-care clauses. If you look at the section of the reply brief that starts at page 11, they say two things. First, that we would otherwise have a substantial argument under Article II, which is about as close as the government goes to confessing error in a brief once it's already taken a position. But second, they say the only argument on the other side on which they rely, this is subheader A, is the history. And our fundamental submission to this court, and again this has now been the view of many jurists that have looked at this in recent years, we have three members of the Supreme Court expressing doubts, and lower court judges, is that the history is insufficient. We would ask for affirmance. Thank you. Mr. Engel. Thank you, Your Honor, and may it please the Court, Stephen Engel on behalf of the U.S. Chamber of Commerce. The QUTAM provisions of the False Claims Act violate Article II by taking the enforcement of the laws out of the hands of the President and permitting self-appointed and unaccountable bounty hunters who have suffered no injury of their own to enforce the laws on behalf of the United States. Is that true it's no injury on their own? I mean, Stevens, and I understand it's an Article II, or it's an Article III case, but Stevens seems to indicate that there is a private interest. It's the only way for there to be standing that is being litigated. And if you look at the history, it seems to be that the bounty was seen as property of the realtor right away. The pardon examples that I was talking about with your co-counsel had to do with, can we pardon the government's interest as opposed to the private? And the conclusion was by both early presidents that they could not pardon the private interest because that vested in the person when the lawsuit was filed. So Stevens, let me take the pieces in two. Stevens regarded the realtor as having a partial assignment of the U.S. government's interest, the interest in the wrong to the sovereign, and said that that was sufficient for purposes of Article III standing. I think what makes the Dodge example so problematic to me, Dodge is the discussion of the pardon, as your Honor is aware, is that pardon is about offenses against the United States. We're talking here about a discussion which didn't consider Article II, which was an innovation and, as Justice Thomas recognized, was a break from the English tradition of parliamentary supremacy. And they're talking about whether the president can pardon an offense against the United States and what happens to the part of the penalty on behalf of the United States that's actually already in the relator's hands. One of the issues in the Dodge case was it had already been paid. So the question was should the U.S. give it back and can we go to the relator and take it out? But part of that had to do with that vesting right at the moment that the fraud happened. Well, I think there's an interesting question in sort of that common law, the vesting would come, it was an inchoate interest that only comes at the end. And Justice Thomas and others suggested that maybe there must be something else that's different here because otherwise how do you have standing on the other side then? You mentioned the history. It certainly is true that Article II is a complete break from our forefathers, and I'm talking about our English forefathers. But doesn't the fact that we continue to do this, at least in large part, both pre- and post-ratification, a pretty good indication that that break didn't include this? No, I don't think so. Because clearly QITAM was adopted and QITAM statutes were adopted in the early Congresses, but they were aberrational and they fell away shortly within the decades to come. They were revived during the Civil War. But to be clear, there is nothing like and there never has been anything like the False Claims Act since 1986 in the history of QITAM in the sense of we're talking about thousands of cases being filed each year in which relators are purporting to exercise the executive power that's vested in the president. And we've talked about Buckley, but Selah Law could not have been clearer. Selah Law said that the power to seek daunting monetary penalties on behalf of the United States is a quintessential executive power. And this is not an accident. The 1986 amendments were intended to fracture and disperse executive power because some members of Congress thought that the executive wasn't good enough in pursuing fraud against the United States. But the founders, when they created a unitary executive, did so so that the president would be accountable, the officers who exercised executive power on his behalf would be accountable to him, and ultimately the president would be accountable to the people. None of that is happening here where we have this fractured system with hundreds of cases being brought in the name of the United States for the sovereign interest of protecting the public fisc. And this is what makes Keaton such an affront to the Constitution as three justices, as Judge Ho, as Judge Duncan, and others, and as Judge Mizell, in her scholarly opinion, recognized. So is it that just the 1986 innovations were problematic? Was it okay before 1986? No, I think it was problematic from the get-go, but it's clear to say that nobody discussed the constitutional questions at the early time. And even the pardon discussion was a question about the scope of the president's pardon power. It was not a question about Article II and the executive power. And there's been a lot of water under the bridge from the Supreme Court in what Article II means. What is the vesting of all executive power in the president? And so there have always been these issues, but what I'm saying is it's been so sporadic and episodic and not part of our traditions that this post-ratification history tells us very little about what Article II meant. It fell away quickly when it arose in a new and more virulent form in 1986. That question was recognized by the Justice Department, and Attorney General Barr, his opinion at the Office of Legal Counsel, and it's been a question that's been coming up. And as the Supreme Court has clarified and articulated the scope of Article II, we are increasingly seeing how Keaton is an aberrational device that's inconsistent with our traditions and specifically with the text of Article II of the Constitution. Thank you, Mr. Engel. Mr. Winnick, you have three minutes. Thank you, Your Honor. I'd like to speak very briefly to appointments and then to the history. First, on appointments, Justice Thomas's opinion, with which we began today, was predicated on his view in that case that there was no intervention by the government after the seal period. That makes a huge difference to government control. And in any event, you don't have to decide any of the significant authority issues. In the appointments clause context, as long as you recognize there's no continuing role. My friend said today his argument on the continuing role is there's lots of relators at a given time. Why would Justice Thomas omit that discussion? In other words, he raises significant questions on the appointment clauses but says nothing about the continuous nature. What does that mean? I don't know, Your Honor, but I do think it's a core part of the appointments clause analysis. And, again, their only argument is there are many relators at a given time. The same would have been true of the civil surgeons in Germain and the merchant appraisers in Alfmort. As to the history, let me just sort of respond to the three points they make. First, they say there was little enforcement. My friend worded that very carefully to talk about the provisions of the first Congress. It certainly isn't true as to the provisions enacted through the third Congress, the Slave Trade Act enacted in 1794. There was lots of enforcement. There were cases brought and adjudicated by constitutional luminaries, including two of the three authors of the Federalist Papers. Second, they say it fell into disuse. I don't think you get that impression from reading the Supreme Court's opinions in Marvin in 1909 or Marcus in 1943, both of which talk about key tam as a bedrock feature of American law, not as an afterthought that had been enacted at the founding. There wasn't much enforcement, though, between the Civil War and 1986. I mean, that just is true. At the federal level, that may have been true, certainly, but key tam as a broader feature of American law was bedrock, and that's clear from those opinions which they don't talk about. And, finally, on government control. First of all, their own amici disagree with them. Take a look at the Meese brief, Attorney General Meese's brief, beginning at page 22. Their own amici disagree with them as to the extent to which there was government control at the founding. That brief cites Calabresi anew. Professor Cy Prakash has said the same in his article on the chief prosecutor, which is all over the amicus briefs. And so I think their story that there was no government control at the founding is a historically complex one. I'm not sure it's correct, but even if they are correct about that, it follows a fortiori that the modern version of the False Claims Act, with extensive government control, the government can intervene and dismiss at the outset. It can intervene at any later point, subject to a very flexible good cause standard, and move to dismiss under a very flexible Rule 41 standard, goes a very long way to making clear that relators do not have the independent power that they think. And I think with that in mind, any constitutional problem, either on appointments or on the vesting and take care clause, go away. We ask this court to reverse. Thank you. Mr. Singh, you have three minutes as well. I'd like to weave together just a few of the threads that we've been talking about to maybe see if we can come up with a cohesive answer to this question about significant power. I think the challenge that's posed here is that when we talk about significant executive power and we pull snippets from cases like Buckley or CELA law, it's tempting to say, oh, these lawsuits must be significant power. But terms like that are only properly understood through the lens of history. And the point of the history here— Can you respond to your opposing counsel's question at the end of his argument about the criminal prosecution part? It seems to me that you do have to answer that. Yeah, sure. So we cited a Larview article in our reply brief by Alan May, which says that actually in these cases where there were criminal and civil penalties, the criminal provisions were simply ignored in the civil cases. We don't actually know that there were significant amounts of private criminal prosecutions. But assuming argument—and they haven't shown any record that there really were. They cited one statute that said something about whipping with no enforcement record to back that up. So I'm not sure that it even was a thing. But if that—well, it's a thing because Congress passed it. And if those are not and you will not defend that, then how do you draw the line between that and this? Well, I actually don't—so I'm not taking a position about whether those are constitutional or not. I think, you know, when Justice Scalia talked about originalists and faint-hearted originalists, he took the view that something that may be constitutional, even if very stupid, in private criminal enforcement may fall in that category. I don't know—no one has really taken a position on it. In either case, I would distinguish— It's hard to defend that with modern understandings of Article II. In either case, I would distinguish it, Your Honor, by saying that these lawsuits are fundamentally different. And the way you know that is that they are extensively controlled by the government throughout. So the other side talked about the 1986 amendments being uniquely bad. They're actually quite good. The difference between the statute in 1943, when the Supreme Court upholds it in Marcus— and we talk about this case a lot in pages 14 and 15 of our brief— that version of the statute gave the government almost no control. And there actually was significant quitem enforcement, private enforcement, prior to 1943. There's no doubt that if these were— if the quitem provisions in the early founding were constitutional, then this would have to be. I just don't think that—for the reasons you're talking about. It is a fiduciary. But it has to flow from that. But the question is, were those constitutional? That's really the question. Yes, Your Honor. Our position is that they were constitutional, and that this is an easy case by comparison because of all of the extra controls placed on the relators by the government, by Congress. And so if you look at— I was about to say the difference between the statute in 1943 and the statute in 1986 is that the government gets all this extra control. And the way they got that—the government complained in 1943 to the Supreme Court. These actions are upsetting our executive power. They are taking away from our discretion with respect to wartime issues, really weighty executive issues. And what the Supreme Court said was, you're addressing your complaints to the wrong forum. Have Congress fix this. Congress did. And this is a critical point, I think, in this context. The executive branch has tremendous sway over how this statute is worded, how it is implemented in practice, and how it is enforced day to day. And they exercise that discretion all the time. Any suggestion that the statute takes away from the executive in a manner that infringes on their constitutional prerogatives is, we think, foreclosed by doctrine and history. Thank you, Mr. Singh. Thank you, all attorneys here today. And we have your case under advisement. Thank you.